IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DARRYL T. LAWRENCE, | ) | |
| | ) | Case No. 04 C 2979 |
| Plaintiff, | ) | |
| | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| JEWEL FOOD STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Darryl Lawrence ("Lawrence" or "Plaintiff") is an African American male who was employed by Jewel Food Stores, Inc. ("Jewel" or "Defendant") as a truck driver for ten years. On January 27, 2003, Jewel discharged Lawrence after he allegedly failed to account to his supervisor's satisfaction for more than four hours of his time during his January 11, 2003 shift. Lawrence brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*, contending that Jewel's real reason for discharging him was race.

Jewel now moves for summary judgment on Plaintiff's Title VII claim. Jewel argues (1) that this court lacks jurisdiction to hear Plaintiff's Title VII claim because the collective bargaining agreement between Defendant and Plaintiff's union ("CBA") contains a waiver of Plaintiff's statutory right to a judicial forum for this claim; (2) that Plaintiff cannot establish a prima facie case for race discrimination because he has not identified any similarly-situated non-African American truck driver who was treated more favorably by Jewel; and (3) that Plaintiff cannot establish that the reason Defendant articulates for his termination – misappropriation of company time – is a pretext for discrimination.

This Court holds that Plaintiff's union's collective bargaining agreement did not waive his right to pursue a Title VII claim in federal court. As to the merits of Plaintiff's Title VII claim, this Court finds that Plaintiff has not met his burden of showing that a genuine issue of material fact exists that Jewel treated any similarly-situated non-African American truck driver more favorably than Plaintiff or that Jewel's articulated reason for discharging Plaintiff was a pretext for discrimination. Accordingly, Jewel's Motion for Summary Judgment is granted.

## STATEMENT OF FACTS

Lawrence, an African American male, had roughly a decade of experience[1] as a Jewel delivery truck driver before being terminated on January 27, 2003. (Def.'s 56.1 ¶¶ 1, 4.)[2] For the duration of his employment, Lawrence operated out of Jewel's distribution warehouse complex in Melrose Park, Illinois, which served as a distribution point for all Jewel grocery stores within a 180-mile radius. (*Id.* at ¶ 5, 6.)

**The Union Shop**

Throughout his employment with Jewel, Lawrence was a member of the International Brotherhood of Teamsters, Local 710, formerly known as the Chicago Truck Drivers, Helpers and Warehouse Workers Union ("the Union" or "Plaintiff's union"). (Def.'s 56.1 ¶ 7.) On September 16, 1998, the Union and Jewel executed a CBA that governed the terms of Lawrence's and the other

---

[1] Plaintiff's amended complaint states that he was hired in 1991, (Am. Compl. ¶ 4), but Plaintiff admitted himself during his deposition that he was actually hired on October 18, 1993, (Def. 56.1 ¶ 2; Lawrence Dep., p. 66).

[2] The facts are presented in the parties' statements pursuant to Local Rule 56.1. Defendant's Statement of Undisputed Material Facts is cited as "Def.'s 56.1 ¶ __"; Plaintiff's Response is cited as "Plaintiff's Response ¶ __"; Plaintiff's Statement of Additional Facts is cited as Pltf.'s 56.1(b)(3)(B) ¶ __"; and Defendant's Response is cited as "Def.'s Response ¶ __". Where Plaintiff has made no response to paragraphs of Defendant's 56.1 Statement, those paragraphs are deemed admitted. Where Plaintiff has offered support for his denials or for additional statements of fact, his version is credited for the purpose of deciding this motion.

unionized truck drivers' employment from April 1, 1998 through Lawrence's termination. (*Id.* at ¶ 8.) Three provisions of that CBA are important in this case.

Section 3.8 of the CBA sets out a nondiscrimination policy, reading in relevant part:

> Neither the employer nor the Union shall discriminate against any employee or prospective employee because of race, creed, color, sex, age, national origin, handicap, or union membership. Any alleged violation of this Article shall be processed in accordance with the Grievance and Arbitration procedures contained in this Agreement.

(*Id.* at ¶ 9; CBA § 3.8 at DEF00413-00414.)

The CBA also contains two arbitration clauses. The first is the clause referenced by § 3.8 of the CBA; § 12.1 reads in relevant part, "The Employer shall not discipline nor discharge any employee without just cause. . . . Any employee . . . may request an investigation of his discipline or discharge through the grievance procedure as follows." (Def.'s 56.1 ¶ 9; CBA § 12.1 at DEF00432-00433.) The "procedure as follows" is a standard three-step grievance process: (1) an employee files a grievance to be informally negotiated between a union representative and a Jewel representative, (2) should these parties fail to arrive at an agreeable solution, the grievance is referred to a more formal Joint Grievance Committee made up of several union and Jewel representatives, and (3) if this body is deadlocked, "either the Employer or Union may invoke the arbitration procedure." (Pltf.'s 56.1(b)(3)(B) ¶ 241; CBA §§ 12.1, 12.2(1)(c) at DEF00432-00434.)

The second arbitration clause, which sets out fundamentally the same three-step grievance process, is more general; § 12.2 covers, "[a]ll grievances relating to the interpretation or application of any provision of this [CBA], other than the discipline and discharge of an employee." (Def.'s 56.1 ¶ 9; CBA § 12.2 at DEF00433-00434.) Lawrence acknowledged receiving a union booklet in 1998 or 1999, (Pltf.'s 56.1(b)(3)(B) ¶¶ 28, 31-33; Lawrence Dep., pp. 36-37), and testified that he

understood that the Union represented him in dealing with Jewel and that he had the right to file a grievance with the Union for matters affecting his employment.  (Pltf.'s 56.1(b)(3)(B) ¶¶ 34, 35; Lawrence Dep., p. 38).

**Jewel's Management Structure and Discipline Policy**

From late 2000 or early 2001 until January 2005, Steven Coren held the position of Transportation Manager for Jewel's Transportation Department.  (Pltf.'s 56.1(b)(3)(B) ¶¶ 6, 9.) Coren had responsibility for the entire Transportation Department, which at the time he assumed the post was comprised of some 360 drivers (including Lawrence), roughly fifty mechanics, forty third-party drivers, a management staff of twenty, and a clerical staff of twelve. (*Id.* at ¶¶ 7, 8, 10.) Coren testified that while he accepts responsibility for "everything that happens in [the] Transportation [Department]," including disciplinary decisions, (*Id.* at ¶ 227; Coren Dep., p. 79), he did not make all of them personally.  Rather, lower-level, immediate supervisors would handle discipline for minor infractions and might make initial decisions on suspension pending review by himself or one of his superintendents.  (Def.'s Response ¶ 227; Coren Dep., pp. 51-52.)  Coren testified that although he received copies of every disciplinary memoranda from his superintendents as the Transportation Manager, he is not able to review each disciplinary decision personally.  (Def.'s Response ¶ 227; Coren Dep., pp. 77-78.)  Coren testified that even when he does personally make a personnel decision – as he did in Plaintiff's case – he attempts to get input from other managers. (Coren Dep., p. 79.)

Jewel truck drivers themselves did not directly report to Coren.  Instead they reported to dispatch managers, called senior supervisors.  (Pltf.'s 56.1(b)(3)(B) ¶ 11, 14.)  At the time of Lawrence's termination, Jewel had four senior supervisors, covering three eight-hour shifts.  (*Id.* at

4

¶¶ 4, 12, 16.) Because the truck drivers started and ended their shifts at all different hours, the shifts of any particular senior supervisor and any particular truck driver were not necessarily congruent. (*Id.* at ¶ 17.) That is to say, a driver could start his shift reporting to one senior supervisor and end it reporting to another. Because the truck drivers worked different shifts on different days, they also did not always report to the same senior supervisor from day to day. (*Id.* at ¶¶ 15, 24.) The drivers would report to whichever senior supervisor was on-duty during their shift. (*Id.* at ¶ 22.)

Lawrence contends that Jewel has a progressive discipline policy in which the first disciplinary response to an infraction by an employee is a verbal warning, followed by a written warning, a one-day suspension, a two-day suspension, a three-day suspension, and indefinite suspension pending review to termination. (*Id.* at ¶ 201; Lawrence Dep., pp. 40-41.) Jewel, however, contends that while there is a progressive discipline policy, it relates to attendance, vehicle accidents, and other less serious infractions. (Def.'s Response ¶ 201.) Consistent with this testimony, the Jewel Osco manual on Driver Rules of the Road states that the extension or stealing of time while on the job is a terminable offense. (Def.'s Response ¶ 201; Lawrence Dep., Ex. 2.) Although Jewel maintains that it may terminate an employee for misappropriation of company time, it admits that its managers retain the discretion to offer less severe disciplinary action based on case-by-case determinations. (Pltf.'s 56.1(b)(3)(B) ¶¶ 220, 222-26; Ziehlke-Reece Dep., p. 64; Coren Dep., pp.83-85.)

**Routing and Tracking Procedures**

Jewel uses a load-planning software package called "Trucks" at its warehouse complex. (Def.'s 56.1 ¶ 10.) "Trucks" automatically sorts the incoming inventory orders for the area Jewel store locations and creates delivery routes to be completed by Jewel's warehouse truck drivers during

their shifts. (*Id.*) At the beginning of each shift, drivers select their routes for the day based upon seniority. (*Id.* at ¶ 11.) Though he does not contest Defendant's assertion that routes are awarded pursuant to seniority, Lawrence asserts that one of the Jewel supervisors, Mike Terlisky, gave him the same route every Saturday. (Pltf.'s 56.1(b)(3)(B) ¶¶ 138, 139;Coren Dep., pp. 100-01.)

After choosing their runs, drivers then receive a computer-generated log or "trip sheet" for each route selected. (Pltf.'s 56.1(b)(3)(B) ¶ 13.) The trip sheet identifies the stores along the driver's route, provides directions, and estimates the mileage to be traveled and the amount of time necessary for the driver to complete each route. (*Id.*) The computer-generated estimates on the trip sheets automatically build in time for delays of less than six minutes. (Def.'s 56.1 ¶ 16.) Drivers are required to report any delays of more than one half hour to management, and extensive delays must be "called in every half hour after the initial half-hour delay." (Pltf's Response ¶ 14; Lawrence Dep., pp. 72-73.)

Each Jewel truck is equipped with a computer that tracks and records the truck's movements. (Pltf.'s 56.1(b)(3)(B) ¶ 65.) The driver is required to enter into this computer, referred to as the "Cadec system," information concerning his activities during the run, including the time he left the warehouse, arrived at the store location, began unloading, left the store, or crossed a state line. (*Id.* at ¶ 67.) All information from this Cadec system is stored on a disc which is downloaded by one of the transportation clerks at the end of each shift. (*Id.* at ¶¶ 75-77; Lawrence Dep., pp. 61-62.)

**Events of January 11, 2003**

On Saturday, January 11, 2003, Lawrence began his shift at 2:00 p.m., and selected three routes for the workday, which according to his trip logs had an estimated total time of completion of approximately eight hours. (Def.'s 56.1 ¶¶ 23, 24; Lawrence Dep., pp. 85-87, Exs. 11, 12.)

Lawrence received his work assignments and his first trip sheet at 2:12 p.m., but he did not leave the warehouse until 3:30 p.m. – ninety minutes after starting his shift, and seventy-eight minutes after receiving his assignments and trip sheet. (Def.'s 56.1 ¶¶ 25, 26; Lawrence Dep., pp.87-88; Ex. 12.) Lawrence explained that an entry he made for refueling at the end of his trip log should, in fact, have been marked as having occurred in the period between receiving his first assignment and actually leaving the warehouse complex. (Lawrence Dep., pp. 106-07.) The trip sheet for Lawrence's first run estimated a three hour and twenty-five minute completion time from the time he received his route until his return to the warehouse. (Def.'s 56.1 ¶ 28; Lawrence Dep. Ex. 12.) Lawrence returned to the warehouse at 7:20 p.m., recording a thirty minute delay for restacking pallets. (Def.'s 56.1 ¶¶ 28, 29; Lawrence Dep. Ex. 12.) Thus, including the ninety minute delay prior to his departure, it took the Lawrence five hours and eight minutes to complete a run that was estimated to take just three hours and twenty-five minutes.

Lawrence received the trip sheet for his second run at 7:29 p.m. Again, there was a long delay before he finally left at 9:19 p.m., one hour and fifty minutes after receiving his trip sheet. (Def.'s 56.1 ¶ 31; Lawrence Dep., pp. 91-92.) Plaintiff returned to the warehouse at 10:24 p.m. (Def.'s 56.1 ¶ 34; Lawrence Dep., p. 92.) Though no delays were recorded on his trip sheet, Lawrence took two hours and fifty-five minutes to complete this second run, which was estimated to require just one hour and fifty-five minutes. (Def.'s 56.1 ¶¶ 33-34; Lawrence Dep., p. 92, Ex. 12.)

Lawrence received his third trip sheet at 10:37 p.m., but left the warehouse seventy-seven minutes later at 11:54 p.m. (Def.'s 56.1 ¶¶ 36, 37; Lawrence Dep., pp. 98-99.) The estimated time for completion of Lawrence's third run was two hours and thirty-eight minutes, but Lawrence did not return to the warehouse until 3:48 a.m., five hours and eleven minutes after he received the run

sheet, and almost four hours after he left. (Def.'s 56.1 ¶¶ 39, 40; Lawrence Dep., p 104, Ex. 12.) This delay, however, included his scheduled one-hour dinner break and possibly another hour of break time due to his extended shift. (Def.'s 56.1 ¶ 40; Lawrence Dep., pp. 103-04.) After returning to the warehouse this third time, Lawrence clocked out of his shift at 5:25 a.m. January 12, 2003 – fifteen hours and twenty-five minutes after he had started. (Def.'s 56.1 ¶ 41; Lawrence Dep., p. 105.) During the shift, putting aside any recorded or unrecorded delays he may have faced while out on his routes, Lawrence spent almost four and a half hours in the warehouse complex without recording any cause for these in-complex delays. (Def.'s 56.1 ¶ 42; Lawrence Dep., pp. 88-89, 92, 98-99.)

Lawrence made deliveries to the same stores every Saturday, and both he and Supervisor Terlisky were aware of the particular problems and delays attributed to delivering to these stores. (Pltf.'s 56.1(b)(3)(B) ¶ 110, Lawrence Dep., pp. 93-94.) Lawrence cites the downtown location of one store and its proximity to bars, clubs and other nightlife, which made it difficult to get into the small garage during the congestion of the Saturday night. (Pltf.'s 56.1(b)(3)(B) ¶¶ 128-131; Lawrence Dep., pp. 99-100.) For this reason, he claims, he could not try to deliver to the store until after midnight. (*Id.*) Additionally, Lawrence notes that he was delivering produce, which goes immediately from the truck to the store floor. (*Id.*) Because produce cannot be moved to the floor while the store is open and customers are there, Lawrence was required to wait until midnight, when the store closed. (*Id.*) Lawrence states that he did not record these delays on his run sheet because Terlisky was aware that these difficulties would cause delays as they had caused delays for Plaintiff each Saturday he made deliveries to these same stores. (Pltf.'s 56.1(b)(3)(B) ¶ 132; Lawrence Dep., p. 100.) Jewel contends that Lawrence was never excused from the obligation to record the reasons for a delay incurred during his shift. Lawrence admits that neither Mike Terlisky nor any other Jewel

8

supervisor ever told him not to record his reasons for delay because the supervisor was already aware of the cause of the delay. (Def.'s 56.1 ¶ 43; Lawrence Dep., pp. 100-01.)

**Lawrence's Disciplinary Record**

Lawrence alleges that he has an unblemished work history and was never disciplined before January 16, 2003. (Pltf.'s 56.1(b)(3)(B) ¶ 95.) The record shows two disciplinary memos on Lawrence's record. The first, a written warning, relates to an incident in December 2000 when Lawrence neglected to use his Cadec card while driving a non-delivery truck. (Def.'s Response ¶ 95; Lawrence Dep., Ex. 9.) Although Lawrence acknowledges the incident, he states that he was unaware at the time that he needed to use his Cadec card for all runs, not just those in the delivery trucks. (Def.'s Response ¶ 95; Lawrence Dep., pp. 75-79.)

The second memo relates to delays brought to Lawrence's attention by a Transportation Supervisor, John Turner, for the workday of March 10, 2001. There were six categories of delays, totaling 500 minutes. (Def.'s Response ¶ 95.) Lawrence acknowledges the incident and that the information in the memo was accurate. (Def.'s Response ¶ 95; Lawrence Dep., pp. 79-83.) The memo ends with the statement, "Darryl understands that management is looking closely at the top 10 associates in delays with the intention of getting a better understanding of their delays and their workday in general." (Def.'s Response ¶ 95; Lawrence Dep., Ex. 10.) Lawrence denies that Turner ever told him that he was in the top ten people in his group for delays nor warned him that future delays might result in discipline. (Lawrence Dep., pp. 82-83.)

**Lawrence's Indefinite Suspension and Discharge for Misappropriation of Company Time**

Senior supervisor Lyn Ziehlke-Reece met with Lawrence on the day of his next shift to discuss his work on January 11, 2003, and asked him to explain the apparent unexplained delays.

(Def.'s 56.1 ¶¶ 44, 45.) Ziehlke-Reece states that Lawrence admitted to her that he was "screwing around" on January 11, and was willing to take a suspension. (Def.'s 56.1 ¶ 46; Ziehlke-Reece Dep., p. 32.) Lawrence denies making any such admission. (Pltf.'s Response ¶ 46; Lawrence Dep., p. 109.)

On January 16, 2003, Ziehlke-Reece and Union Steward Kurt Klein met again with Lawrence to discuss his performance on January 11, 2003. (Def.'s 56.1 ¶ 47.) During this meeting, Lawrence stated that his seventy-eight minute delay in departure from the warehouse for his first run was the result of giving directions to another driver and a delay in getting fuel for his truck. (Def.'s 56.1 ¶ 48; Lawrence Dep., p. 107; Ziehlke-Reece Dep., pp. 34-35.) He stated he "could not remember" why he was delayed in departure for his second run, and that his departure for his final run was delayed while he waited at the warehouse because the store he was to deliver to would be "backed up." (Def.'s 56.1 ¶¶ 49, 50; Lawrence Dep., pp. 117-18; Ziehlke-Reece Dep., p. 35.) Following this meeting, Lawrence was put on indefinite suspension for the misappropriation of company time. (Def.'s 56.1 ¶ 51; Lawrence Dep., Ex. 11; Ziehlke-Reece Dep., p.36.) Ziehlke-Reece prepared a memo recounting the meeting and placed it in Plaintiff's file. (Def.'s 56.1 ¶ 52; Lawrence Dep., Ex. 11.)

Transportation Manager Coren met with Lawrence on January 27, 2003. (Def.'s 56.1 ¶ 53.) At this meeting, Coren read Lawrence Ziehlke-Reece's memo and asked Lawrence if it was an accurate reflection of what happened during the January 11 shift and Lawrence stated that it was.[3]

---

[3] The Ziehlke-Reece memo reads in relevant part:

On January 11, 2003, Mr. Lawrence was assigned to Run #63081 with two stops; store #3344 and store #3368. Mr. Lawrence received his work at 14:12 hours. This represented an unexplained delay of one hour and eighteen minutes until his departure. When questioned about the excessive complex time, he said he was giving another driver directions to the Lockport, IL store and getting fuel. His total time was 5:28 hours for 3:25 hours

(Lawrence Dep., pp. 119-21.) Lawrence did not offer any additional explanations to Coren for the in-complex delays incurred during the shift in question. (*Id*.) Although Lawrence testified that Supervisor Terlisky was aware of and approved of the manner in which Lawrence conducted himself, (Pltf.'s Response ¶ 54; Lawrence Dep., pp. 100-02), the record does not reflect that Lawrence told Coren this fact, and Supervisor Terlisky was not present at this meeting. Lawrence did not claim that the delays he faced on the January 11 shift were delays that he had encountered as part of previous Saturday deliveries. (Coren Dep., pp. 86-87.) Lawrence's explanation during this meeting was insufficient to substantiate his time to the satisfaction of his employer.[4] (Def.'s 56.1 ¶ 54; Coren Dep., p. 85.)

Following the meeting, Coren, after consultation with other members of his management team present, made the decision to terminate Lawrence. (Def.'s 56.1 ¶ 55; Coren Dep., p. 78.)

---

on paper, returning to dispatch at 19:29 hours.

On Mr. Lawrence's 2nd pull, #61669 with one stop at store #3344, he received his Trip Sheet Log at 19:29 hours and did not depart the complex until 21:19 hours, a total of one hour and fifty minutes without any delay time listed. The answer to the questions posed regarding this complex delay was "I can't remember". The total trip time for this run was 3.13 hours for 1:55 hours on paper, with a return time to dispatch of 22:37 hours.

On the next pull, Run #61601 with one stop at store #3368, Mr. Lawrence received his Trip Sheet Log at 22:37 hours with no departure until 23:54 hours, incurring another one hour and seventeen minutes of unexplained delay. Upon questioning the reason for this excessive delay, he stated he knew the store was backed up from his pervious trip there. Total time for this pull was 6.8 hours for 2:38 on paper, to include another 90 minutes of lunch and breaks before ending his day at 5:25 hours.

Through the employment of excessive unreported complex time, Mr. Lawrence was able to extend an 8:24 hour day on paper to a total of 14:57 hours.

[4] Plaintiff's 56.1(b)(3)(B) Statement asserts that, "Coren does not recall if he personally asked Lawrence in the meeting about the unsubstantiated time." (¶ 190.) Looking into the record, while this statement is technically true, it is potentially misleading. Lawrence was given an opportunity to explain the delays incurred on his January 11 shift during the January 27 meeting as even Plaintiff himself testifies. (Lawrence Dep., pp. 119-21.) Coren was simply unable to recall whether he personally asked Lawrence to do so or another superintendent present at the meeting actually asked the question. (Coren Dep., p. 81.) Lawrence's testimony suggests that it was Coren who asked the question. (Lawrence Dep., pp. 119-21.)

**Jewel's Personnel Decisions Involving Other Employees**

Lawrence has identified several other Jewel truck drivers who allegedly misappropriated company time but were not terminated.

Ziehlke-Reece suspended Ernest Miller for two days by in October 1998 for doing personal business on company time, taking an extended lunch break, failing to complete his log, and being involved in an accident. (Pltf.'s 56.1(b)(3)(B) ¶ 252.) Initially, Miller was suspended indefinitely, but that suspension was reduced after Miller met with Wayne Forsythe, admitted his wrongdoing and promised not to engage in the behavior again. (Pltf.'s 56.1(b)(3)(B) ¶ 252.) Miller's race is not evident from the record.

Tom Teslicka was suspended for three days in December 2002 for theft of company time, specifically, sleeping on the job for one hour and three minutes. (Pltf.'s 56.1(b)(3)(B) ¶¶ 253, 254.) He too received an indefinite suspension at first, but following an explanation that he took the nap because he was sick and giving his promise not to grieve any disciplinary decision, Teslicka received a three-day suspension. (Pltf.'s 56.1(b)(3)(B) ¶ 254.) Teslicka's race is not evident from the record.

Doug Miller was suspended for two days in November 2002 for the possible misappropriation of company time and extension of work, and that the rest of his discipline was to be decided after further investigation of the incident. (Pltf.'s 56.1(b)(3)(B) ¶ 255.) Miller's race is not evident from the record.

George Canfield was suspended for one day in April 2002 for "extension of workday" and improper and inadequate driver logs. (Pltf.'s 56.1(b)(3)(B) ¶ 256.) Canfield was unable to substantiate forty-five minutes of excess time, and admitted to inaccurately logging his time. (Pltf.'s 56.1(b)(3)(B) ¶ 256.) The personnel memorandum to which Lawrence directs the Court's attention

was authored by Superintendent Joe Herrmann and does not state who else received a copy of the memorandum or who else attended the meeting at which Canfield's personnel decision was made. Canfield's race is also not evident from the record.

Two additional Caucasian drivers were disciplined for misappropriation of company time. (Def.'s 56.1 ¶¶ 62-68.)  In January of 2003, Phil McDougal and Rich Leverence were placed on indefinite suspension and finally terminated for the misappropriation of company time.  (Def.'s 56.1 ¶¶ 62-68.) Both drivers subsequently were reinstated with full benefits, following arbitration.  (Pltf's Response ¶ 62.)  McDougal was terminated because he was unable to substantiate delays totaling over an hour, while Leverence was terminated for unsubstantiated delays totaling approximately two hours and twenty minutes.  (Def.'s 56.1 ¶¶ 62-68.)  The office memoranda regarding the termination of both drivers state that Coren was involved in the termination of both employees, and in fact notified both of them personally.  (Def.'s 56.1 ¶ 62-68.)

## PROCEDURAL HISTORY

Following his January 27, 2003 discharge, Lawrence filed a first-step grievance through his Union.  His grievance was denied, his termination upheld, and no Union official asked for the grievance to be sent to the Joint Grievance Committee.  (Def.'s 56.1 ¶ 61.)

Rather than continuing to pursue his claim under the CBA, Lawrence filed the instant suit against Jewel.  By an order dated June 29, 2004, this Court granted Jewel's motion to dismiss Count II of Plaintiff's original complaint as preempted by the Illinois Human Rights Act.  Count I of Plaintiff's First Amended Complaint remains, which asserts a claim for racially discriminatory discipline and discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*  Defendant now moves for summary judgment on Count I.

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court, however, will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record, an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

## DISCUSSION

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). An employee alleging a Title VII violation may prove his case directly by putting

forth evidence of his or her employer's discriminatory motivation, but because the direct method of proving racial discrimination "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus," this option is not available to many aggrieved employees. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003); *see Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720-21 (7th Cir. 2005) (outlining the two types of evidence used in the direct method of proving racial discrimination).

In the absence of direct evidence of discriminatory motive, courts apply the burden-shifting test set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). This test begins with an employee presenting a prima facie case of discriminatory discipline and discharge, in which he shows that: "(1) he is a member of a protected class; (2) at the time of his [discipline and] discharge, he was meeting his employer's legitimate expectations; (3) he was [disciplined and] discharged; and (4) his employer treated similarly situated individuals outside of the protected class more favorably." *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002). This prima facie showing creates an initial presumption that the employer unlawfully discriminated against its employee. *See St. Mary Honor Center v. Hicks*, 509 U.S. 502, 506-07 (1993) ("To establish a presumption is to say that a finding of the predicate fact (here, the prima facie case) produces a required conclusion in the absence of explanation (here, the finding of unlawful discrimination).") (internal quotation marks omitted). The presumption created by the employee's prima facie case requires the employer to produce a nondiscriminatory motive for its discipline and discharge of the employee. *See Rozskowiak v. Village of Arlington Heights*, 415 F.3d 608, 614 (7th Cir. 2005); *see also St. Mary Honor Center*, 509 U.S. at 509 (observing that the employer's burden is one of production only and not persuasion). Once the employer produces this

nondiscriminatory motive for its personnel decision, the special burdens and presumptions designed

to compensate for the lack of direct evidence of discriminatory motive fall away, and the employee

is left with the burden of proving the employer's discriminatory intent.  *See Texas Dept. of

Community Affairs v. Burdine* , 450 U.S. 248, 255 (1981).

The employee still has a great advantage in this process, however.  If the employee can show

that the nondiscriminatory reason offered by the employer was not really the employer's true

motivation for disciplining and discharging the employee, then the employee has circumstantial –

although by no means conclusive[5] – evidence that the employer has lied to prevent the court from

discovering its true, discriminatory motivations.  *See Rozskowiak*, 415 F.3d at 614; *Reeves v.

Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the

trier of facts can reasonably infer from the falsity of the explanation that the employer is dissembling

to cover up a discriminatory purpose.").

In support of its Motion for Summary Judgment, Defendant first argues that this Court is

without jurisdiction over Plaintiff's Title VII claim because of an arbitration provision in Plaintiff's

union's collective bargaining agreement with Defendant.  But because a union cannot surrender its

employees' Title VII rights, particularly where the waiver is not "clear and unmistakable," Plaintiff

may proceed on the merits of his claim.  As to that claim, Plaintiff is without direct evidence of

Defendant's discriminatory motivation for disciplining and discharging him.  Plaintiff therefore must

present a prima facie case of discrimination and show that Defendant's proffered motivation for

---

[5] The ultimate inquiry is whether or not the employer discriminated and thus a court is not compelled to find for the employee even if the employee has proved his prima facie case for discrimination and the court believes the employer's proffered "legitimate" motivation to be a lie.  *See St. Mary's Honor Center*, 509 U.S. at 511.  Title VII will not punish an employer whose proffered motivation is mere pretext for another equally nondiscriminatory motive.

firing him – misappropriation of company time – is pretextual. Defendant concedes for the purposes of summary judgment that Plaintiff is a member of a protected class, that Plaintiff met its legitimate expectations,[6] and that Plaintiff was disciplined and discharged. Defendant contests whether Plaintiff has proven that Defendant treated any similarly situated, non-African American employee differently than it treated Plaintiff. If Defendant is correct, it would be under no obligation to offer a nondiscriminatory motivation for its decision to discipline and discharge Plaintiff and would be entitled to summary judgment in its favor. In the alternative though, Defendant argues that Plaintiff has not proven that the nondiscriminatory reason it offered – that Plaintiff was disciplined and discharged for misappropriating company time – was a pretext for its true motive, discrimination.

Because this Court finds that Plaintiff has failed to prove that a genuine issue of material fact exists as to whether similarly situated non-African American employees were treated differently or that Defendant's proffered reason for discharge was pretextual, Defendant Jewel is entitled to judgment as a matter of law.

## I.      Waiver by Collective Bargaining Agreement

Defendant argues that this Court is without jurisdiction over Plaintiff's Title VII claim because the collective bargaining agreement between Plaintiff's union and Defendant contains a purported waiver of Plaintiff's statutory right to a judicial forum.

---

[6] The second element of the traditional prima facie case fits somewhat awkwardly in this sort of discipline and discharge case. "[W]here the issue is whether the plaintiff was singled out for discipline [and discharge] on a prohibited factor, it 'makes little sense . . . to discuss whether she was meeting her employer's reasonable expectations.'" *Curry v. Menard, Inc.*, 270 F.3d 473, 477-78 (7th Cir. 2001), quoting *Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999). Rather "where the plaintiff produces evidence sufficient to raise the inference that the employer applied its legitimate employment expectations in a disparate manner, the second and fourth prongs of a prima facie case merge, allowing the plaintiff to establish a prima facie case by demonstrating that similarly-situated employees were treated more favorably." *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002).

Although an individual employee may sign away his or her right to bring a civil rights claim in the federal forum by way of a take-it-or-leave-it contract, *see, e.g.*, *Oblix, Inc. v. Winiecki*, 374 F.3d 488, 490 (7th Cir. 2004) (compelling arbitration of a discharged employees alleged discrimination under Title VII where employee signed an employment contract reading, "any dispute . . . arising out of or related to . . . [the employment agreement] shall be resolved exclusively by binding arbitration"); *Koveleskie v. SBC Capital Markets, Inc.*, 167 F.3d 361, 369 (7th Cir. 1999) (compelling arbitration of an allegedly constructively discharged employee's sexual discrimination claim), the same "benefit of the bargain" rationale has not been extended to agreements to arbitrate contained in collective bargaining agreements negotiated on behalf of an individual employee by his or her union. *See EEOC v. Indiana Bell Telephone Co.*, 256 F.3d 516, 522 (7th Cir. 2001) ("[A] union cannot surrender employees' rights under Title VII"), citing *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70, 75-76 (1998); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974); *Pryner v. Tractor Supply Co.*, 109 F.3d 354 (7th Cir. 1997)).

In *Pryner v. Tractor Supply Co.*, the Seventh Circuit addressed the question of "whether a collective bargaining agreement can compel the arbitration of a federal antidiscrimination claim." *Pryner*, 109 F.3d at 356, 360. The *Pryner* Court characterized the conflict as one between the majority's contractual rights and the minority's statutory rights, observing that:

> The collective bargaining agreement is . . . negotiated by the union elected by a majority of the workers in the bargaining unit [and] binds all members of the unit . . . The statutory rights at issue . . . are rights given to members of minority groups because of concern about the mistreatment . . . of minorities by majorities.

*Id.* at 362. In cases where an individual employee signs an employment contract himself, with no intermediary between himself and his employer, there is no concern that one party might be

contracting away the statutory rights specifically designed to protect another.[7] *See id.* at 363

("[W]orkers' statutory rights . . . are arbitrable if the worker consents to have them arbitrated."). But

given the potential for such a conflict in the case of a collective bargaining agreement, the *Pryner*

Court held that "the union cannot consent *for* the employee." *Id.*

Defendants rely on *Wright v. Universal Maritime Service Corporation*, 525 U.S. 70 (1998),

to assert that Plaintiff's union validly has waived Plaintiff's right to a federal forum for his Title VII

claim. In *Wright*, the Supreme Court specifically passed on resolving "the question of the validity

of union-negotiated waiver," leaving decisions like *Pryner* in place. *Id.* at 77. Instead the Supreme

Court said only that if a union-negotiated waiver of the judicial forum for a claim of employment

discrimination may ever be valid, it must at least be "clear and unmistakable." *Id.* at 80.

The collective bargaining agreement at issue in *Wright* outlined a grievance procedure for

"all matters affecting wages, hours, and other terms and conditions of employment . . . Anything not

contained in this Agreement shall not be construed as being part of this Agreement." *Id.* at 73. In

concluding that the waiver was not clear and unmistakable, the *Wright* court found both that "the

arbitration clause is very general" and could be understood to be limited to matters in dispute under

the contract and that "the remainder of the contract contains no explicit incorporation of statutory

antidiscrimination requirements." *Id.* at 80.

Applying the two *Wright* factors to Plaintiff's collective bargaining agreement yields the

conclusion that Plaintiff's union did not negotiate a "clear and unmistakable" waiver of Plaintiff's

---

[7] The emphasis on the consent of individual employee to the terms of a union-negotiated collective bargaining agreement is a bit quixotic given the fiction of consent when an individual employee signs a contract of adhesion containing a requirement to arbitrate civil rights claims. Additionally, the union seems to be the agent of employee at the bargaining table and, as a matter of common law, an agent's consent often is binding on the principal.

right to a judicial forum for his Title VII claim. Section 12.2 of the Plaintiff's union-negotiated collective bargaining agreement matches the general arbitration clause in *Wright* and is limited to disputes arising under the contract. But in addition to this general arbitration clause, § 12.1 of Plaintiff's union-negotiated collective bargaining agreement contains an additional arbitration clause specifically applicable to "discipline and discharge" which nowhere uses the limiting word "Agreement."[8] This arbitration clause could be read as evidence of a waiver extending beyond rights outlined in the contract if it were not for the specific language used in § 12.2 to characterize what is excluded from its scope. Section 12.2 reads in relevant part, "All grievances related to the interpretation or application of any provision of this Agreement, other than the discipline and discharge of an employee, shall be processed as follows." (DEF 00432.) The phrase "other than the discipline and discharge of an employee" removes some class of grievances from the universe of "[a]ll grievances related to the interpretation or application of any provision of this Agreement." The most natural interpretation of the former phrase is that the class of grievances excluded from § 12.2 are discipline and discharge grievances *related to the interpretation or application of any Provision of this Agreement*. Moreover, reading § 12.2 and § 12.1 together, leads one to determine that what has been excluded from the general provision of § 12.2 was intended to be included in the more specific provision of § 12.1. Read this way the instant arbitration clause, like the clause in *Wright*, does not constitute a clear and unmistakable waiver.

Turning to the second *Wright* factor, the instant collective bargaining agreement, unlike the collective bargaining agreement in *Wright*, does contain an explicit antidiscrimination provision.

---

[8] Section 12.1 reads in relevant part, "The Employer shall not discipline nor discharge any employee without just cause. . . . Any employee . . . may request an investigation of his discipline or discharge through the grievance procedure as follows."

That antidiscrimination provision, however, does not itself contain an "explicit incorporation of statutory antidiscrimination requirements." Section 3.8 of Plaintiff's union-negotiated collective bargaining agreement reads in relevant part:

> Neither the Employer nor the Union shall discriminate against any employee or prospective employee because of race, creed, color, sex, age, national origin, handicap or union membership. Any alleged violation of this Article shall be processed in accordance with the Grievance and Arbitration procedures contained in this Agreement.

Although this antidiscrimination clause closely tracks the applicable provision of Title VII,[9] when the *Wright* court looked for an "explicit incorporation," it was addressing contracts to arbitrate more akin to the one found in *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001).[10] In *Adams* the arbitration clause read in relevant part:

> I agree that I will settle any and all previously unasserted claims, disputes or controversies arising out of or relating to my application or candidacy for employment, employment and/or cessation of employment with Circuit City, *exclusively* by final and binding *arbitration* before a neutral Arbitrator. By way of example only, such claims include claims under federal, state, and local statutory or common law, such as the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, as amended, including the amendments of the Civil Rights Act of 1991, the Americans with Disabilities Act, the law of contract and [the] law of tort.

*Id.* at 109-10. The second sentence more aptly contains an "explicit incorporation of statutory antidiscrimination requirements." Section 3.8 of Plaintiff's union-negotiated collective bargaining agreement would have drawn closer to a clear and unmistakable waiver if it had included language

---

[9] 42 U.S.C. § 2000e-2(a)(1) reads in relevant part: "It shall be an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin."

[10] By citing *Adams*, this Court does not suggest that a reference this bald will suffice, but merely offers the quoted clause as a juxtaposition to the provision of Plaintiff's union-negotiated collective bargaining agreement.

referring even to a violation of federal or state law in addition to or instead of the phrase "alleged violation of *this Article*." But, as written, the provision falls short of contributing to a "clear and unmistakable" waiver of Plaintiff's right to a judicial forum for his Title VII claim.

This Court, therefore, concludes that Plaintiff's union-negotiated collective bargaining agreement does not contain a waiver of Plaintiff's right to this judicial forum clear and unmistakable enough to deprive this Court of jurisdiction. In the alternative, given the absence of a definitive Supreme Court ruling on the issue and controlling Seventh Circuit precedent,[11] this Court holds that even a clear and unmistakable waiver by the union would be unenforceable against the employee.

## II.      Plaintiff's Title VII Claim

Plaintiff acknowledges that because there is no direct evidence of Defendant's discriminatory motivation, Plaintiff must prove his claim through the *McDonnell Douglas* burden shifting analysis. *See McDonnell Douglas Corp.*, 411 U.S. at 802-04. That analysis requires Plaintiff to present a prima facie case of discrimination and show that Defendant's proffered motivation for firing him was a pretext. With regard to Plaintiff's prima facie case, Defendant concedes that Plaintiff is a member of a protected class, that Plaintiff met its legitimate expectations, and that Plaintiff was disciplined and discharged. As to the remaining prima facie element, Defendant argues that Plaintiff has not proven that Defendant treated any similarly situated, non-African American employee differently than it treated Plaintiff. Alternatively, Defendant argues that even if Plaintiff could establish a prima

---

[11] The Seventh Circuit extended the holding in *Pryner* to all collective bargaining agreements. *Johnson v. Bodine Electric Co.*, 142 F.3d 363, 366 (7th Cir.1998) ("*Pryner's* description of when arbitration of Title VII claims would be allowable in an employment context shows that *Pryner* applies to all CBAs."). In the Seventh Circuit, after *Wright*, *Pryner* continues to be cited favorably for the proposition that an employee's contractual rights under a collective bargaining agreement are legally independent of his or her statutory rights under federal antidiscrimination laws. *See, e.g.*, *Tice v. American Airlines*, 288 F.3d 313, 317 (7th Cir. 2002).

facie case, Plaintiff still has not proven that Defendant's proffered nondiscriminatory reason – that Plaintiff was discharged for misappropriating company time – was a pretext for discrimination.

### A.    Similarly Situated Employees

To make out his *prima facie* case Plaintiff must prove that Defendant treated at least one similarly situated, non-African American employee more favorably in making discipline and discharge decisions.  "A similarly situated employee is one who is 'directly comparable to [the plaintiff] in all material respects.'"  *Bio v. Federal Express Corporation*, 424 F.3d 593, 597 (7th Cir. 2005, quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).  All relevant factors must be considered, and which factors are relevant depends in part on the particular type of discrimination an employee alleges.  *Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000).  "For example, in disciplinary cases – in which a plaintiff claims that he was disciplined more harshly than a similarly situated employee based on some prohibited reason – a plaintiff must show that he is similarly situated with respect to performance, qualifications and conduct.  This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (internal citations omitted).  The Court's job is to consider any factor making two employees similarly or dissimilarly situated, "provided the employer considered these . . . factors in making the personnel decision."  *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003).

It is undisputed that Plaintiff did not log some four hours worth of delays for his January 11, 2003 workday. Furthermore, while there is a dispute as to whether or not Plaintiff's immediate supervisor approved of Plaintiff's informal method of operation, it is undisputed that Plaintiff did not offer the explanation he now gives the Court for his unlogged time to either Reece, the supervisor who put him on indefinite suspension, or Coren, the manager who discharged him. Plaintiff now points to six Jewel truck drivers – Phil McDougal, Rich Leverence, George Canfield, Larry Ksepka, Tom Teslicka, and Ernest Miller – who he asserts were similarly situated to him and not members of the protected class, but were treated more favorably by Defendant. Upon appropriate scrutiny of each individual, Plaintiff has not proven their similarity to a sufficient degree to establish a prima facie case and create a presumption that discrimination motivated Defendant to discipline and discharge him.

At the beginning, the Court addresses one of Plaintiff's arguments applicable to each allegedly similarly situated driver. Plaintiff argues that Coren as the Transportation Manager bore the ultimate responsibility for all personnel decisions and, as such, is the relevant decision maker for disciplinary action involving any driver. While Coren actually conducted the meeting at which the decision was made to discharge Plaintiff, the record demonstrates that other supervisors and superintendents often made discipline decisions with tacit oversight from Coren. (Def.'s Response ¶ 227; Coren Dep., pp. 51-52, 77-78.) Lest this Court eviscerate the "same decision maker" rule, Plaintiff must show that Coren acted in the former decision making role with respect to any employee Plaintiff claims was treated more favorably than himself. *See Rogers*, 320 F.3d at 754 ("A decisionmaker is the person responsible for the contested decision.").

The first two drivers to whom Plaintiff compares himself are both non-African American: Phil McDougal and Rich Leverence. Coren testified that McDougal and Leverence, like Plaintiff, were put on indefinite suspension and then terminated after failing to log delays which they could not later substantiate upon inquiry. (Coren Dep., pp. 92-99.) If anything, McDougal and Leverence were treated more severely than Plaintiff because McDougal and Leverence had only an hour and a half of unaccounted time before Defendant suspended and discharged them as compared to Plaintiff's four plus hours. (Coren Dep., 95, 98; Coren Dep. Exs. 3 and 4.) Plaintiff counters that unlike himself, McDougal and Leverence were rehired by Jewel after their respective terminations. But Defendant did not voluntarily rehire either McDougal or Leverence, rather it was forced to rehire them following arbitration on their behalf by their union.[12] (Coren Dep., 95-96, 98-99; DEF00405-DEF00436.) Under such circumstances, McDougal and Leverence are not considered to have received more favorable treatment by the employer, "[i]n order to be a relevant comparison, however, the company . . . must have voluntarily reinstated these employees. Here the company terminated the two employees and was forced to rehire them when the company lost in arbitration. . . . Again, if taken on its face, this example runs in favor of the company-demonstrating that the company did *not* treat these employees *differently* from Hiatt, but rather demonstrating that the company stuck by its decision to terminate each." *Hiatt v. Rockwell International Corp.*, 26 F.3d 761, 771 (7th Cir. 1994) (emphasis in original).[13]

---

[12] Plaintiff also makes an allusion to the argument that Plaintiff was discriminated against because he was not given the opportunity to go to arbitration in order to force Defendant to rehire him. Under Plaintiff's union's collective bargaining agreement with Defendant, the decision to arbitrate a grievance is controlled by Plaintiff's union not Defendant.

[13] *But see EEOC v. Indiana Bell Telephone Co.*, 256 F.3d 516, 522 (7th Cir. 2001) (stating that "an arbitrator exercises powers delegated from the parties who have agreed to arbitrate. The arbitrator acts on their (joint) behalf, with whatever authority the contract bestows. The resulting award is effectively the parties' joint decision. . . . An employer

For a similar reason the third driver to whom Plaintiff points, the presumably non-African American[14] Ernest Miller, is not similarly situated. Miller, like Plaintiff, had an incomplete log of his time and to make matters worse was found to be doing personal business on company time and taking extended breaks. Unlike Plaintiff, Miller was not placed on indefinite suspension and discharged, but rather was suspended for just two days. Miller's personnel decision, however, came in 1998, at least two years before Coren would become the decision maker as to who was discharged for what sort of misconduct. The similarly situated analysis requires a showing that the personnel decisions for both employees were made by the same decision maker. *See Little v. Illinois Dept. of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004); *Radue*, 219 F.3d at 618 ("When different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects.") (internal quotes and citations omitted). Furthermore, two employees who commit similar sorts of misconduct will not be considered similarly situated if there is a difference in the level of their contrition for that misconduct. *See Spath*, 211 F.3d at 397. The evidence to which Plaintiff points regarding Miller's suspension indicates that like Plaintiff, he was initially given an indefinite suspension. (Ziehlke-Reece Dep., Ex. 2.) After a one-on-one meeting with Miller, Wayne Forsythe "asked if we could change the Indefinite Suspension due to Mr. Miller's honesty and promise that this would never happen again." (*Id.*) Nothing in the record shows that Plaintiff has demonstrated similar honesty or contrition. Because of this fact and the different decisionmakers, Lawrence and Ernest Miller are not similarly situated for the purpose of establishing Plaintiff's prima facie case.

---

is free to delegate, to arbitrators or anyone else, but the holder of the delegated power still speaks for the employer.").

[14] Plaintiff does not actually point to any evidence in the record that Miller is not a member of the same protected class as Plaintiff. On this ground alone, the Court could find that Plaintiff has not proven that Miller is a similarly situated, non-African American driver who was treated more favorably by Defendant.

Plaintiff also cannot prove that the fourth, presumably non-African American truck driver Tom Teslicka is similarly situated to him. Plaintiff has not shown that the disciplinary decision regarding Teslicka, which fell short of termination, was made by Coren. Like Plaintiff, Teslicka was put on indefinite suspension when he was unable to account for more than an hour of his time. (Coren Dep., Ex. 6.) A memorandum from Alan DalPonte reads in relevant part "I met with Tom Teslicka (Driver #724), Lyn Ziehlke-Reece (Dispatch Manager), George Selimos (Union Steward), and Jim Bowen (Union Steward) to resolve Mr. Teslicka's Indefinite Suspension . . . for theft of company time . . . the Indefinite Suspension was resolved to a 3-Day Suspension without Pay with the understanding that Mr. Teslicka would not grieve this issue."[15]  (Coren Dep., Ex. 5.)  The decision thus was made by DalPonte, and Coren is not even listed as one of the persons in attendance at the meeting "to resolve Mr. Teslicka's Indefinite Suspension." (*Id.*)  Coren made the decision to terminate Plaintiff. Because Plaintiff has not proven that Coren was the same decision maker with regard to Teslicka's personnel decision, Teslicka and Plaintiff are not similarly situated.

With regard to the fifth and sixth drivers, Plaintiff does not present enough evidence to prove that either the presumably non-African American Doug Miller or the presumably non-African American George Canfield are similarly situated to him but were treated more favorably. Plaintiff's 56.1(b)(3)(B) statement asserts that Miller received a two day suspension for several hours of unaccounted for time. (Pltf.'s 56.1(b)(3)(B) ¶ 255.) The memorandum in the record indicates that Miller, like Plaintiff, received an indefinite suspension to be finally resolved after a more in-depth investigation of Miller's workday. (Coren Dep., Ex. 7.) No evidence cited by Plaintiff shows that

---

[15] Just as a criminal defendant is likely to get a better plea deal from the government if he agrees to waive all rights to appeal and collaterally attack that deal, an employer might rationally offer an employee a more lenient punishment in exchange for the employee not contesting the punishment.

this indefinite suspension later was reduced to a two day suspension instead of resulting in a discharge as it did in Plaintiff's case. Because Plaintiff also has not shown that Coren played any role in Miller's discipline – the exhibit is a note to file from Larry Ksepka – regardless of Defendant's actual treatment of Miller, Plaintiff would not have established his prima facie case for discrimination. *See Little*, 369 F.3d at 1013 (requiring Plaintiff to point to evidence that the same decision maker made each of the employment decisions).

Finally, with regard to George Canfield, Plaintiff points to a memorandum that indicates Canfield received a one-day suspension for inaccurately logging his delays. (Pltf.'s 56.1(b)(3)(B) ¶ 255.) The memo is authored by Joe Hermann, a superintendent. (Coren Dep., Ex. 8.) The memo indicates that Mr. Hermann made the decision not to punish Canfield more severely. (*Id.*) There is no evidence that Coren played any role in the investigation of the claims against Canfield or the ultimate discipline decision. (*Id.*) Because Joe Hermann, a different decisionmaker, determined Canfield's punishment, Plaintiff has not succeeded in proving that Canfield is similarly situated to him in a manner that would establish a prima facie case.

Because Plaintiff has not shown that a genuine dispute of material fact exists regarding whether any non-African American drivers employed by Defendant and similarly situated to Plaintiff were treated more favorably than himself, Plaintiff has not established a prima facie case for discrimination. This ground alone supports the Court's grant of summary judgment for Defendant.

## B.     Pretext

Even if Plaintiff could have established a prima facie case for discrimination, he would also need to show that a genuine issue of fact existed as to whether Defendant's proffered reason for

terminating him was a pretext for discrimination in order to survive summary judgment. Defendant states that it terminated Plaintiff not because of his race, but rather because it believed Plaintiff had misappropriated company time. Defendant's belief is based on Plaintiff's failure to account for more than four hours of delays on his January 11, 2003 shift and his later failure to offer satisfactory explanations for these delays when asked by the decision maker that placed him on indefinite suspension and the decision maker that eventually discharged him. Plaintiff has failed to raise a genuine issue disputing that this explanation is a pretext.

"Pretext exists where the ostensible reason for the employment decision is really a lie contrived to mask unlawful discrimination." *Little*, 369 F.3d at 1012; *see Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995) (defining pretext as "a lie, specifically a phony reason for some action."). In order to show pretext, Plaintiff must demonstrate that Defendant's proffered motivation "is a lie or completely lacks a factual basis." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). Pretext is not established by showing that a business decision was mistaken, ill-considered, or even unreasonable. *See Sample v. Aldi Inc.*, 61 F.3d 544, 551 (7th Cir. 1995) (failing to find pretext where employer might have failed to promote a well-educated employee); *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 657-58 (7th Cir. 1991) (failing to find pretext where employer fired employee for putting the shareholders' interest ahead of employer's personal interest). Rather so long as the employer "honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist."[16] *Little*, 369 F.3d at 1012. Finally, while a finder of fact is under no obligation to

---

[16] While true that the Seventh Circuit follows the honest-belief rule, its decisions have observed that, "the more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held. . . . Conversely, it is also true that, the more objectively *un*reasonable a belief is, the more likely it will seem that the decisionmaker did *not* actually hold it." *Little*, 369 F.3d at 1013 (emphasis in original).

believe the employer's proffered motivation simply because the employer has produced it, an employee cannot "avoid summary judgment by merely claiming that a jury could disbelieve the employer's reason." *Traylor v. Brown*, 295 F.3d 783, 791 (7th Cir. 2002) (granting summary judgment for the employer in a Title VII suit where employee offered only her own conjecture to call employer's proffered motive into question).

It is undisputed that Plaintiff failed to log three delays totaling over four hours during his January 11, 2003 shift. (Def.'s 56.1 ¶ 42; Lawrence Dep., pp. 88-89, 92, 98-99.) It is undisputed that drivers are required to log any delays they experience during their shift lasting longer than a few minutes and call in certain lengthy delays such as the hour-plus delays experienced by Plaintiff on his January 11, 2003 shift. (Pltf's Response ¶ 14; Lawrence Dep., pp. 72-73.) It is undisputed that Plaintiff did not log any of the delays in question on that shift or call them in and that he was never told not to log his delays. (Def.'s 56.1 ¶ 43; Lawrence Dep., pp. 100-01.)

Plaintiff explains that he did not record these delays on his run sheet because Terlisky was aware that these difficulties would cause delays as they had caused delays for Plaintiff each Saturday he made deliveries to these same stores. (Pltf.'s 56.1(b)(3)(B) ¶ 132; Lawrence Dep., p. 100.) Terlisky was not deposed and Plaintiff has submitted no evidence to corroborate his claim that Terlisky or any other Jewel supervisor was aware of these difficulties and potential sources of delay. Perhaps more important, Plaintiff has not shown that he made Coren aware of this implicit understanding prior to Coren's decision to discharge him. (Pltf.'s Response ¶ 54; Lawrence Dep., pp. 100-02.) Given the undisputed facts regarding Plaintiff's activities on January 11 and the lack of evidence regarding any understanding between Lawrence and Terlisky, Plaintiff has not shown that Defendant's proffered justification for the discipline and discharge – Plaintiff's failure to

substantiate significant unlogged delays – "is factually baseless" or "were not sufficient to motivate the discharge." *See Peters*, 307 F.3d at 548-49. Plaintiff's failure to establish that a genuine dispute of material fact exists showing that Jewel's reason for his discharge was a pretext for discrimination further justifies summary judgment in Defendant's favor.

## CONCLUSION AND ORDER

Because the collective bargaining agreement negotiated by Plaintiff's union did not through clear and unmistakable language waive his right to pursue a Title VII claim in federal court – and likely could not have so waived his right anyway – Plaintiff has the right to have his claim adjudicated before this Court. Reviewing all of the evidence in the record and drawing all reasonable inferences in favor of Plaintiff, there is no genuine issue as to any material fact that Jewel treated similarly-situated non-African American truck drivers more favorably than Plaintiff or that Jewel's articulated reason for discharging Plaintiff was a pretext for discrimination. Wherefore, Jewel's Motion for Summary Judgment is granted.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Dated:  April 14, 2006                  Northern District of Illinois

31